# EXHIBIT 1

PROIMMUNE RESELLER DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT ("Agreement") is entered into as of this 24th day of April 2020 ("Effective Date")

BETWEEN

Three Aminos, LLC, a limited liability company formed under the law of the State of Georgia, United States of America and having its principal place of business at 1215 Troon Ct, Alpharetta, GA, 30005, USA ("Three Aminos") ("Distributor");

AND

The ProImmune Company, L.L.C., a limited liability company formed under the law of the State of Delaware, United States of America and having its principal place of business at 64 East Market Street, Rhinebeck, New York 12572 ("ProImmune").

WHEREAS

ProImmune is the owner of various property rights associated with Immune Formulation 200®.

Distributor is engaged in sales, marketing, and distribution of dietary supplements.

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged and in consideration of the above premises and the mutual promises stated below, the Parties agree as follows:

1. DEFINITIONS AND INTERPRETATION

    1.1. "Force Majeure" means, any circumstances beyond the reasonable control of either Party including, without limitation, any act of God, epidemic, fires, floods, war or act of war (whether declared or undeclared), sabotage, accidents, insurrection, riot, strike, lock out or other form of industrial action or government intervention.

    1.2. "Intellectual Property Rights" means all relevant industrial and other intellectual property rights owned or controlled by ProImmune related to the Products comprising or relating to: (a) Patents; (b) Trademarks; (c) internet domain names, whether or not trademarks, registered by any authorized private registrar or governmental authority, web addresses, web pages, website, and URLs; (d) works of authorship, expressions, designs, and design registrations, whether or not copyrightable, including copyrights and copyrightable works, software and firmware, application programming interfaces, architecture, files, records, schematics, data, data files, and databases and other specifications and documentation; (e) Trade Secrets; (f) formulas, compounds, preparations, components and know-how; and (g) all industrial and other intellectual property rights, and all rights, interests, and protections that are associated with, equivalent or similar to, or required for the exercise of, any of the foregoing, however

1

arising, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, these rights or forms of protection under the laws of any jurisdiction throughout in any part of the world.

1.3. "Invoice" means the invoice issued by ProImmune upon receipt of a Purchase Order from Distributor.

1.4. "Permitted Field" means the marketing and sale of Product solely as a dietary supplement and solely for human consumption, and excludes any non-human use as well as any use other than as a dietary supplement (e.g., excluding use as a food additive, an over the counter drug, a prescription drug, or a medical device).

1.5. "Pickup Address" means, the location where Distributor can acquire Product specified by ProImmune in its Invoice.

1.6. "Pickup Date" means, the date when Distributor can acquire Product specified by ProImmune in its Invoice.

1.7. "Parties" means, parties to this Agreement and "Party" means either of them.

1.8. "Patents" means all patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions, and extensions thereof), patent applications, and other patent rights and any other governmental authority-issued indicia of invention ownership (including inventor's certificates, petty patents, and patent utility models).

1.9. "Product(s)" means Immune Formulation 200 and such other goods as the Parties may agree to in writing from time to time.

1.10.     "Purchase Order" means Distributor's written request for a particular amount of Product delivered to ProImmune.

1.11.     "Specification" means the composition of Immune Formulation 200 which is a proprietary mix of Selenium and amino acids (Glycine, L-Glutamine, and L-Cystine).

1.12.     "Term" means the period commencing from the Effective Date and ending upon its termination or expiration in accordance with this Agreement.

1.13.     "Territory" shall mean the entire world except Malaysia, Singapore, Brunei, Thailand, Indonesia, and the Philippines.

1.14.     "Trademarks" means all rights in and to US and foreign trademarks, service marks, trade dress, trade names, brand names, logos, trade dress, corporate names, and domain names and other similar designations of source, sponsorship, association or origin, together with the goodwill symbolized by any of the foregoing, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, these rights and all similar or equivalent rights or forms

2



of protection in any part of the world. Trademarks includes "Immune Formulation 200®" and "ProImmune®".

1.15.    "Trade Secrets" means all inventions, discoveries, trade secrets, business and technical information and know-how, databases, data collections, patent disclosures and other confidential and proprietary information and all rights therein.

1.16.    Unless the context otherwise requires, in this Agreement:

1.16.1. words using the singular number shall also include the plural number vice versa and words denoting any gender shall include all genders;

1.16.2. references to any "person" include any natural person, corporation, judicial entity, association, statutory body, partnership, limited liability company, joint venture, trust, estate, unincorporated organization or government, state or any political subdivision, instrumentality, agency or authority;

1.16.3. the words "include" or "including" shall be deemed to be followed by "without limitation" or "but not limited to" whether or not they are followed by such phrases or words of like import; and

1.16.4. references to any Party shall be construed as a reference to such Party's successors and permitted assigns.

1.16.5. Any references in this Agreement to the "Agreement" include all amendments, additions, and variations thereto agreed between the Parties.

2.  APPOINTMENT OF DISTRIBUTOR

2.1. ProImmune hereby appoints Distributor as a non-exclusive distributor for the sale, marketing, and distribution of the Product solely in the Territory and solely in the Permitted Field, Distributor hereby agrees to act in that capacity, subject to the terms and conditions of this Agreement.

2.2. Distributor agrees not to directly market or solicit orders outside the Territory and Permitted Field.

2.3. Distributor may use sub-distributors or sales agents. In the event Distributor appoints an agent or sales representatives ("Sub-Distributors") to act on its behalf, any compensation to such agents or sales representatives shall be Distributor's sole responsibility. Distributor shall ensure Sub-Distributors are bound by the same obligations as Distributor under the Agreement. Distributor will be liable for any breach of the obligation of this Agreement by its Sub-Distributors.

2.4. Subject to Section 2.6 below, ProImmune may, at its sole discretion, sell, supply, or otherwise provide or deliver Product to any other person, firm, or company.

3

2.5. This Agreement shall create an obligation on ProImmune to supply Product to Distributor only upon Initial Funds Clearance pursuant to Section 2.6 below.

2.6. Once ProImmune receives a Purchase Order from Distributor, issues an Invoice, and receives Initial Funds in the form of cleared funds ("Initial Funds Clearance"), ProImmune shall be obligated to act in good faith to fulfil that Purchase Order subject to the terms of this Agreement. Upon Initial Funds Clearance, Distributor's order shall be assigned a position in ProImmune's manufacturing priority order and ProImmune may not interfere with said order to favor any other distributor to the disadvantage of Distributor, without Distributor's written permission.

2.7. Subject to Section 6.2, any Product which is being ordered for the purpose of any approved clinical trial shall receive manufacturing priority, such that it will be fulfilled first among any other outstanding orders for which manufacturing has not yet begun ("Priority").

2.8. During the calendar year 2020, ProImmune agrees to supply Product to Distributor regardless of order amounts. For each calendar year after 2020, ProImmune agrees to continue supplying Product to Distributor so long as Distributor submits Purchase Orders, in aggregate, for at least 60,000 kg of Product in the current or in the preceding calendar year ("Priority Performance"). Further, in the event Distributor has achieved Priority Performance its Purchase Orders shall be accorded Priority status. For the avoidance of doubt, the 19,000 kg in Product already ordered by Distributor shall be included in the aggregate order amount for 2020. Notwithstanding the above, ProImmune is only obligated to accept Purchase Orders and to fulfil order amounts to the extent permitted by its manufacturing capacity although this will not affect Distributor's Priority Performance and subsequent Priority status for orders.

2.9. The Parties agree to negotiate in good faith for a subsequent agreement whereby Distributor would obtain exclusive rights to distribute a unique formulation incorporating Product or a uniquely branded version of Product with a six-million-dollar annual minimum order amount and a clinical trial conducted by Distributor ("Subsequent Agreement"). The Parties hope to conclude such an agreement within sixty days. In the event that the Subsequent Agreement is not entered into, all of the terms and conditions of this Agreement will remain fully binding on both Parties. In the event that the Subsequent Agreement is entered into, all of the terms and conditions of this Agreement will remain fully binding on both Parties unless there is an explicit agreement to the contrary in the Subsequent Agreement.

3. TERMS OF PURCHASE

3.1. All Purchase Orders shall be made by Distributor directly to ProImmune. Purchase Orders shall include a requested amount of Product ("Requested Amount"). Distributor shall not directly communicate with ProImmune's manufacturers or suppliers without ProImmune's prior written permission. In the event such permission is granted,

4

communications may not exceed the scope of the permission granted and such permission may be withdrawn at ProImmune's sole discretion.

3.2. ProImmune shall make a good faith effort to issue an Invoice to Distributor within five (5) business days of receipt of a Purchase Order. This Invoice shall include the total cost of Requested Amount ("Purchase Amount"), bank information for a wire transfer or information for payment by bank check, a Pickup Address, and an estimated pickup date ("Estimated Pickup Date").

3.3. Upon receipt of an Invoice, Distributor shall pay fifty percent (50%) of the Purchase Amount ("Initial Funds") to ProImmune by bank check or wire within five (5) business days. The Initial Funds shall be non-refundable.

3.4. Upon receipt of Initial Funds, ProImmune will initiate manufacturing and will make commercially reasonable efforts to adhere to the Estimated Pickup Date.

3.5. Upon completion of manufacturing, ProImmune shall inform Distributor that manufacturing of the Requested Amount has been completed ("Product Availability Date"), at which point Distributor shall pay by bank check or wire the remaining fifty percent (50%) of the Purchase Amount within five (5) business days to ProImmune. In the event that payment the full Purchase Amount is not paid within sixty (60) days of the Product Availability Date to ProImmune, title in the Product will revert to ProImmune and ProImmune shall keep any amount of the Purchase Amount previously paid.

3.6. After receipt of the entire Purchase Amount, ProImmune shall make the Requested Amount available to Distributor at the Pickup Address. The date on which the Requested Amount is made available to Distributor shall be the "Actual Pickup Date". Distributor is responsible for picking up or shipping the Product, but ProImmune shall reasonably coordinate with any manufacturers or third-party shippers. In the interests of clarity, payment must be made in full before Distributor obtains Product.

3.7. Distributor has thirty (30) days from Product Availability Date to pick-up Requested Amount after which time Distributor shall be required to pay any storage fee charged to ProImmune plus a ten percent (10%) markup which must be paid before Product pickup. In the event that the Requested Amount has not been collected within six (6) months from the Product Availability Date and the Parties have not agreed in writing to alternate arrangements, title in the Product will revert to ProImmune and ProImmune shall keep the entire Purchase Amount.

3.8. All Purchase Orders shall be made in writing, by mail, fax, or electronic mail. Verbal requests to purchase or to modify an existing order shall not be valid until followed up in writing and confirmed in writing by ProImmune.

4. INSPECTION AND ACCEPTANCE OF PRODUCT

4.1. Distributor shall be provided with a certificate of analysis for any Requested Amount ("Certificate of Analysis") at the time of pickup that shall be consistent with the Specification. Distributor may further test Product at its own expense within twenty-one (21) days from the Actual Pickup Date while Product remains at the Pickup Address to ensure the Product conforms to the Certificate of Analysis ("Testing Window").

4.2. Any rejection or claim not made within the Testing Window while Product remains at the Pickup Address will be deemed waived and released. Risk in the Product shall pass to Distributor on the date on which Distributor collects the Product at the Pickup Address.

4.3. Any Product that does not comply with the Certificate of Analysis may be rejected by Distributor. Distributor must leave any rejected Product at the Pickup Address.

4.4. Within thirty 30 days of receiving rejected Product, ProImmune shall respond stating whether it accepts or disputes the rejection. In the event the rejection is disputed, the Parties shall, after good faith negotiation as to whether the rejection is justified, refer such dispute to a mutually acceptable independent laboratory with the appropriate expertise to assess the conformity or non-conformity of the rejected Product to the Certificate of Analysis.

4.5. If such laboratory determines that Distributor's rejection of Product was improper, Distributor shall pay the costs of testing and review by the laboratory and for both the initially rejected Product and any replacement produced at Distributor's request.  In the event that Distributor appropriately rejected Product, Distributor shall have the right to replacement of the rejected Product as soon as reasonably practicable at no further cost to Distributor. The remedy under the foregoing sentence shall be Distributor's sole remedy for failure of Product to meet Specifications.

4.6. In the event that the Parties cannot agree upon an independent third laboratory within thirty (30) days from ProImmune's disputing a rejection, the dispute may be resolved pursuant to the dispute resolution provision in Section 24 below.

4.7. Title to the Product shall pass from ProImmune to Distributor at the point in time that Distributor collects the Product at the Pickup Address and ProImmune receives full payment for the Product.

4.8. Other than Product rejected in accordance with the terms of this Section 4, Product is non-returnable and non-refundable.

4.9. ProImmune will make a good faith effort to make Requested Amount available to Distributor no later than eight (8) weeks from ProImmune's receipt of the Initial Funds in cleared funds.

5.  PRICE AND PAYMENT TERMS

6

5.1. Prior to the Effective Date, the price for 1,000 kg or more of bulk Product will be $0.10 per gram ("Bulk Price"). After the Effective Date, ProImmune may increase the Bulk Price by no more than ten (10) percent annually. In addition, ProImmune may further increase or decrease the Bulk Price on the basis of changes to its actual costs. In the event that ProImmune increases the Bulk Price pursuant to the terms of this Section 5.1, the Parties each agree to increase their respective sale and re-sale prices of the Product by at least the amount of any such increase (with respect to ProImmune, including the sale price listed on www.proimmuneco.com).

5.2. ProImmune shall sell the Product to Distributor at the Purchase Amount. The Purchase Amount does not include federal, state, or local taxes applicable to the Product sold under this Agreement which under no circumstances shall be the responsibility of ProImmune. Distributor shall sell the Product to customers in the Territory and Permitted Field at any price it deems fit plus any and all sales tax, goods and services tax, value added tax or any other tax of a similar nature payable in connection thereto.

5.3. All payments under this Agreement to ProImmune shall be made in United States Dollars by bank check, wire, or any such means the Parties may hereafter agree. All payment is be made in full prior to pickup of any Product.

6. MARKETING, LABELING, AND ALTERATIONS

6.1. The Distributor shall not in any way alter the nature, quality, or composition of the Product and shall not make any false or misleading representations in respect of the Product, provided however, in no circumstances shall Distributor be liable for any representation made in reliance upon or accordance with any of ProImmune's written representations, information, or marketing materials provided to Distributor. Distributor may not combine the Product with other ingredients without ProImmune's prior written approval.

6.2. Any scientific or clinical testing of Product by Distributor must be pre-approved in writing by ProImmune. The decision of whether to grant such approval shall be made by ProImmune in good faith. Notwithstanding any other term in this Agreement, any and all scientific or clinical testing by Distributor must comply with all applicable state and federal laws and regulations.

6.3. Any labels or marketing material which Distributor develops in connection with marketing and selling the Products must be pre-approved by ProImmune before any use, such approval not to be unreasonably withheld, conditioned or delayed. In any event, Distributor shall insure that the label on the formulation it distributes commercially states that such formulation contains Immune Formulation 200® by ProImmune®.

6.4. Distributor may not alter any labeling, marketing materials, or packaging associated with the Product without the prior written permission of ProImmune, provided that Distributor and ProImmune agree that any such labeling shall include Distributor's name, address (per Distributor's notice in Section 20.1.1.2) and a website

7

(www.orderproimmune.com) or any other domain name that is approved pursuant to Section 6.3 above. Except for labels, marketing materials, and packaging provided by ProImmune for use in the United States, Distributor is responsible for ensuring that any labeling, marketing materials, and packaging conforms with any and all laws, regulations and other governmental or quasi-governmental standards.

7. SALE OF PRODUCT

7.1. Distributor shall be free to establish its own pricing for Products sold. Distributor shall notify ProImmune of its intended and actual pricing.

7.2. Distributor may not sell Product more than four years after the Product Availability Date. Any unsold Product after this time must be disposed of at Distributor's expense.

7.3. If (i) any government agency recommends or requires the recall of any Products or packaging; or (ii) ProImmune determines that any Products or packaging should be recalled from distribution and sale; in either case, based upon a determination that such Products are contaminated, constitute a health or safety hazard, infringe the rights of third parties, or are otherwise not saleable, then ProImmune and Distributor shall coordinate the immediate cessation of sale and distribution or the recall as necessary of all such Products from the Territory. If necessary or advisable, ProImmune and Distributor shall cooperate to recall or reacquire the applicable Products from any purchaser thereof.

8. SUPPORT AND TRAINING

8.1. ProImmune shall from time to time at Distributor expense provide Distributor with reasonable assistance and co-operation as may be reasonably required by Distributor for the sale and distribution of the Product. In no event shall this require ProImmune representatives to personally travel outside of Rhinebeck, New York.

9. WARRANTIES

9.1. ProImmune represents and warrants to Distributor that:

9.1.1.  The Product supplied to Distributor under this Agreement:

9.1.1.1.    is not subject to any security interest, liens or other encumbrances;

9.1.1.2.    at the time of the Pickup Date, is of satisfactory quality, free of residuals and contaminants, and fit in all respects or the purpose(s) for which the Product is intended to be used and shall comply with all and any specifications provided by ProImmune for such Product;

9.1.1.3.    at the time of the Pickup Date, conforms to the ingredient of such Product as described on the label, package inserts and packaging; and is in all respects

8

suitable for distribution or retailing to the customer in compliance with applicable laws, regulations and administrative requirements in the United States; and,

9.1.1.4.    at the time of the Pickup Date, is not the subject of any Food and Drug Administration (FDA) regulatory order to restrict or limit the use of the Product; and,

9.1.2.   the following information provided by ProImmune to Distributor in writing regarding the Product, or use thereof, limited to, the Canadian patent (application number 2,963,131) subject to ongoing updates in the file wrapper, that certain article entitled "A Novel Antiviral inhibits Zika virus infection while increasing intracellular glutathione biosynthesis in distinct cell culture models" co-authored by an affiliate of ProImmune and the statements attached hereto as Exhibit "A", as well as the information available on ProImmune's website (this does not include information available on third party websites which ProImmune's website links to, and does not include third party publications referenced on ProImmune's website), is accurate, correct, and complete in all material respects to the best of ProImmune's knowledge, and ProImmune will promptly provide written notification to Distributor if any such information no longer proves to be accurate, correct, or complete (notwithstanding any term to the contrary, to the extent any of the information in this Section 9.1.2 is used in connection with marketing it must be pre-approved by an attorney with expertise in FDA and Federal Trade Commission (FTC) laws and regulations); and,

9.1.3.   ProImmune has no knowledge of any adverse test results or research findings regarding the Product that would render any of the Product, or use thereof, unsuitable or unsafe for the uses set forth in any Product labeling, packaging, or marketing materials.

9.2. Each Party hereby represents and warrants to and undertakes with the other Party as follows:

9.2.1.   it is a duly organized corporation, validly existing under the laws of its place of incorporation, and has full power and authority to execute, deliver and perform all of its obligations under this Agreement and any other agreements to be executed by it hereunder;

9.2.2.   it has taken all actions, complied with all conditions required, fulfilled and obtained all the necessary consents to enable it to do the following:

9.2.2.1.    lawfully enter into, exercise its rights and comply with its obligations under this Agreement; and

9.2.2.2.    to ensure that those obligations are legally binding and enforceable and have been taken and fulfilled.

9.2.3.   This Agreement is legal, valid and binding of such Party and enforceable against such Party in accordance with its terms.

## 10. INTELLECTUAL PROPERTY

10.1.   ProImmune warrants that:

10.1.1. it has full legal right to use and to authorize the use of the Trademarks associated with the Products in the United States; and

10.1.2. it has full legal rights to use the Patents and Trade Secrets employed in the manufacture of the Product in the United States.

10.2.   ProImmune authorizes Distributor to use Intellectual Property Rights only for the purpose of exercising its rights and performing its obligations under this Agreement.

10.3.   Distributor shall promptly inform ProImmune of the following:

10.3.1. any actual, threatened or suspected infringement of the Intellectual Property Rights which comes to the notice of Distributor; and

10.3.2. any claim by a third party coming to its notice that the distribution of the Product infringes any rights of any other person.

10.4.   Distributor shall not:

10.4.1. alter, remove or tamper with any of the Trademarks, numbers, or other means of identification used on or in relation to the Product; or

10.4.2. use any of ProImmune's Trademarks in any way which may prejudice their distinctiveness or the validity or the goodwill of ProImmune therein; or

10.4.3. modify any of the Trademarks in any way and not use any of the Trademarks on or in connection with any goods or services other than the Products.

10.5.   At no time during or after the term of this Agreement will the Distributor challenge or assist others to challenge ProImmune ownership of, or the validity of, or the registration of, any Intellectual Property Rights.

10.6.   Distributor agrees not to register or assert ownership in any intellectual property rights, including patents and trademarks, associated with the Products, including Intellectual Property Rights, without ProImmune's written pre-approval.

10

10.7.     Distributor hereby acknowledges that, except as expressly provided in this Agreement, Distributor shall not acquire any rights in respect of the Intellectual Property Rights from the distribution and the sale of the Product.

## 11. INDEMNITY

11.1.     ProImmune hereby agrees to indemnify, defend and hold harmless Distributor, its affiliates and all officers, directors, employees and agents thereof (hereinafter referred to as "Indemnitees") from all liabilities, claims, damages, losses, costs, expenses, demands, suits and actions (including without limitation attorneys' fees, expenses and settlement costs) (collectively, "Damages") arising out of or related to the conduct of ProImmune's operations, including without limitation Damages arising out of or related to damage or injury to property or persons, or to any representations of ProImmune.

11.2.     Distributor hereby agrees to indemnify, defend and hold harmless ProImmune, its affiliates and all officers, directors, employees and agents thereof (hereinafter referred to as "Indemnitees") from all liabilities, claims, damages, losses, costs, expenses, demands, suits and actions (including without limitation attorneys' fees, expenses and settlement costs) (collectively, "Damages") arising out of or related to the conduct of Distributor's operations, including without limitation Damages arising out of or related to damage or injury to property or persons, or to any representations of Distributor not authorized hereunder.

11.3.     Insurance. During the term of this Agreement and for four (4) years thereafter, Distributor shall maintain an insurance policy issued by a reputable insurance company, naming ProImmune as an additional insured, which policy shall insure against any and all claims, liabilities, costs or expenses resulting from or caused by (or claimed to be resulting from or caused by) any use or operation of any Products sold by Distributor in the amount of at least $2 million per claim. Distributor shall have the option of having ProImmune add Distributor as an additional insured on its insurance policy which has a limit of $2 million per claim. In the event there is a cost to ProImmune in so adding Distributor this cost shall be paid by Distributor.

## 12. NON-COMPETITION AND NON-CIRCUMVENTION

12.1.     During the term of this Agreement, and until the later of (i) three (3) years after the termination of this Agreement, or (ii) the maximum amount of time permitted by law, thereafter, Distributor shall not develop or market directly or indirectly in the Territory products which are substantially similar with the Product. For the sake of clarity, a product is "substantially similar" to the Product only if it contains (regardless of the presence of other elements) cystine, glycine, and a glutamate source.

12.2.     During the term of this Agreement, and until the later of (i) three (3) years after the termination of this Agreement, or (ii) the maximum amount of time permitted by law, thereafter, neither Party shall directly solicit any of the other Party's suppliers, manufacturers, employees, or known clients, with respect to any further transactions.

11

12.3.    Distributor shall not obtain the Product for resale from any person, firm or company other than ProImmune without ProImmune's prior written permission.

## 13. CONFIDENTIALITY

13.1.    Confidentiality of confidential information will be governed by the Confidentiality and Non-Compete Agreement attached hereto as Appendix 1 ("CDA"). The CDA is hereby incorporated in this Agreement. To the extent any provision of the CDA conflicts with the provisions of the Agreement, this Agreement shall control.

## 14. DURATION AND TERMINATION

14.1.    The Agreement shall come into effect on the Effective Date and shall continue in full force and effect terminated in accordance with the terms of this Agreement. The Agreement shall also apply retroactively to any previously purchased or ordered Product by Distributor from ProImmune.

14.2.    Either Party shall be entitled to terminate this Agreement with immediate effect by written notice to the other Party if:

14.2.1. such other Party commits a material breach of any of the provisions of this Agreement and, in the case of a breach capable of remedy, fails to remedy the same within thirty (30) calendar days after receipt of a written notice from the terminating party giving full particulars of the breach and requiring it to be remedied; or

14.2.2. such other Party makes a voluntary arrangement with its creditors as a result of being subject to an administrative order; or

14.2.3. a court order is made to wind up such other Party or to place it under judicial management or a resolution is passed by the members of such other Party for its winding up or liquidation; or

14.2.4. such other Party ceases, or threatens to cease, to carry on business or becomes insolvent.

14.3.    Any waiver by either Party of a breach of any provision of this Agreement shall not be a waiver of any subsequent breach of the same or any other provision thereof.

## 15. CONSEQUENCES OF TERMINATION

15.1.    Upon termination or expiration of this Agreement for any reason:

15.1.1. Distributor shall have the right to sell off its remaining inventory of Product; provided, however, that Distributor shall comply with all terms and conditions of this Agreement restricting such sale activities.

12

15.1.2. In the event this Agreement is cancelled by ProImmune, any pending Distributor orders for Requested Amounts shall be canceled and any Purchase Amount received by ProImmune for Product that has not yet been picked up by Distributor shall be returned. In the event this Agreement terminates for any other reason, any pending Distributor orders for Requested Amounts shall be fulfilled as soon as commercially practicable following the Termination Date according to the terms of this Agreement.

15.1.3. In the event this Agreement is cancelled by Distributor, Distributor shall remain liable for any outstanding Purchase Order and Purchase Amount, except to the extent such Purchase Order or Purchase Amount relates to the basis of Distributor's claim for breach under Section 14.2.1. above.

15.1.4. Any and all rights and obligations set forth herein which by their nature are intended to extend beyond the term of the Agreement shall survive the expiration or termination of the Agreement, including the provisions of Sections 6-14.

## 16. FORCE MAJEURE

16.1.    Any Party affected by Force Majeure shall notify, as soon as practically possible, the other Party of the nature and extent thereof.

16.2.    Neither Party shall be deemed to be in breach of this Agreement, or otherwise be liable to the other, by reason of any delay in performance, or nonperformance, of any of its obligations, other than any obligation to make payment, hereunder to the extent that such delay or non-performance is due to any Force Majeure of which it has notified the other Party; and the time for performance of that obligation shall be extended accordingly.

16.3.    If the Force Majeure in question prevails for a continuous period in excess of six (6) months, the parties shall enter into good faith discussions with a view to alleviating its effects or to agreeing upon such alternative arrangements as may be fair and reasonable.

## 17. LIABILITY LIMITATION

17.1.    ProImmune's liability arising out of the manufacture, sale, or supplying of the Product or its use or disposition, whether based upon warranty, contract, tort or otherwise, shall not exceed the actual purchase price paid by the distributor for the Product.

17.2.    Notwithstanding the foregoing, no limitation of liability or similar provision under this Agreement shall operate to limit or reduce the payment of insurance proceeds to which a party is entitled.

13

## 18. NATURE OF AGREEMENT

18.1.     Nothing contained in this non-exclusive Agreement shall create a partnership or joint venture or relationship of principal and agent or employer and employee between the Parties and neither Party hereto shall have any right whatsoever to incur any liabilities or obligations on behalf or binding upon the other Party; and that it will not at any time represent orally or in writing to any person or corporation or other business entity that it has any right, power or authority not expressly granted by this Agreement.

18.2.     This Agreement and the CDA supersede all previous agreements and understandings between the Parties with respect thereto, and may not be modified except by an instrument in writing signed by the duly authorized representatives of the Parties.

18.3.     If any provision of the Agreement is, or becomes illegal, unenforceable or invalid, the relevant provision is deemed to be modified to the extent required to remedy the illegality, unenforceability or invalidity. If modification under clause is not possible, the provision must be treated for all purposes as severed from the Agreement without affecting the legality, enforceability or validity of the remaining provisions of the Agreement.

18.4.     The obligations in the Agreement are binding on the Parties themselves, as well as their subsidiaries and affiliates, and their respective shareholders, members, partners, directors, managers, officers, employees, agents and representatives. Further, no Party shall indirectly engage in any activity that is not permitted directly.

18.5.     ProImmune shall have the right to assign its rights, obligations and privileges hereunder to an assignee that agrees in writing to be bound by the terms and conditions of this Agreement. Distributor shall have the right to transfer or assign any of its rights, interest, or obligations under this Agreement only with the prior written consent of the ProImmune, such consent not to be unreasonably withheld. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective permitted successors and assigns of the parties.

## 19. PUBLIC ANNOUNCEMENTS

19.1.     The Parties agree not to make any public announcements about discussions regarding this Agreement or any other related information, plans or proposals, whether in the form of a press release or otherwise, without first consulting with and obtaining the written consent of the other Party.

## 20. NOTICES

20.1.     All notices, demands or other communications pertaining to this Agreement shall be in writing to the contact information below in this Section 20, and shall be deemed to have been duly given if hand delivered, mailed by certified or registered mail, transmitted by facsimile transmission, or sent by electronic mail. Any such notice is

14

deemed served at the time of transmission if hand delivered or made by facsimile or electronic mail.

    20.1.1.1.   THE PROIMMUNE COMPANY, L.L.C.
             64 East Market Street
             Rhinebeck, New York 12572
             Tel No.: 845.876.3222
             Email Address: albertbcrum@aol.com
             Attention to: Dr. Albert Crum

    20.1.1.2.   THREE AMINOS, LLC
             P.O. Box 3026
             Alpharetta, Georgia 30005
             Tel No.: 678.381.1420
             Email Address: drlaura@lilewellness.com
             Attention to: Dr. Laura Lile, M.D., R.Ph.

## 21. COUNTERPARTS

21.1.      This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Signatures may be exchanged by facsimiles or electronic mail. Each Party agrees that it will be bound by its own facsimile or electronic signature and that it accepts the facsimile or electronic signature of the other Party.

## 22. VARIATIONS

22.1.      No modification or variation to this Agreement shall be valid unless it is in writing signed by duly authorized representative of the Parties.

## 23. CONSTRUCTION

23.1.      Each Party acknowledges and represents that, in executing this Agreement, it has had the opportunity to seek advice as to its legal rights from legal counsel and that the person signing on its behalf has read and understood all of the terms and provisions of this Agreement. This Agreement shall not be construed against any party by reason of the drafting or preparation thereof.

23.2.      The headings in this Agreement are inserted for convenience only and shall be ignored in construing the Agreement.

## 24. LAW, JURISDICTION, AND DISPUTE RESOLUTION

24.1.      This Agreement and any dispute or controversy arising out of or relating to this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of law principles thereof. All actions arising out of or relating to this Agreement shall be heard and determined exclusively in any

state or federal court located in New York County, New York State (including as applicable in any appellate courts within New York County, New York State) (collectively, the "Specified Courts"). Each party hereto hereby (i) submits to the exclusive jurisdiction of any Specified Court for the purpose of any action arising out of or relating to this Agreement brought by any Party hereto and (ii) irrevocably waives, and agrees not to assert by way of motion, defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions contemplated hereby may not be enforced in or by any Specified Court. Each party agrees that a final judgment in any action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each party irrevocably consents to the service of the summons and complaint and any other process in any other action or proceeding relating to the transactions contemplated by this Agreement, on behalf of itself, or its property, by personal delivery of copies of such process to such party at the applicable address set forth in Section 20. Nothing in Section 20 or Section 24 shall affect the right of any Party to serve legal process in any other manner permitted by applicable law.

## 25. TIME

25.1.     Time wherever mentioned in this Agreement shall be of the essence.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]



IN WITNESS whereof this Agreement has been executed by the Parties through their duly authorized representatives as of the Effective Date.


Signed: *Albert Crum MD*
Name: Dr Albert Crum
Title: Chief Executive Officer
Organization: The ProImmune Company, L.L.C.
Date: *25 April 2020*


Signed: *Dr. Laura Lile, M.D., R.Ph.*
Name: Dr. Laura Lile, M.D., R.Ph.
Title: *Manager*
Organization: Three Aminos, LLC
Date: *April 25, 2020*

Exhibit A

Both parties agree that corona virus, like many other viruses including Zika and HIV, are members of the RNA family of viruses. RNA viruses all require the metal Zinc to replicate. Physiologically synthesized glutathione is able to chelate elemental Zinc from RNA viruses and thus inhibit viral replication. Glutathione is a key component of the body's innate immune system and an active cell defense to viruses.

Immune Formulation 200® enhances intracellular synthesis of Glutathione. In research published in 2019 and conducted at Georgia State University, Immune Formulation 200® was found in a controlled experiment to effectively inhibit Zika replication in human cells.[1] Previous research has found intracellular glutathione can inhibit a variety of viruses. The antiviral properties of Immune Formulation 200® are discussed in length in a pending US patent application (application number 15/515,036), a foreign analog of which (application number 2,963,131) was allowed in February 2020 for issuance in Canada to treat and inhibit all viral diseases.

---

[1] Vasireddi M, Crum A, May H, Katz D, Hilliard J. A novel antiviral inhibits Zika virus infection while increasing intracellular glutathione biosynthesis in distinct cell culture models. *Antiviral Res.* 2019;161:46–52. doi:10.1016/j.antiviral.2018.09.004.

