# EXHIBIT 2

SECOND AMENDMENT
TO
PROIMMUNE RESELLER DISTRIBUTION AGREEMENT

**THIS SECOND AMENDMENT TO DISTRIBUTION AGREEMENT** ("Second Amendment") is entered into as of October 30, 2020 ("Effective Date").

BETWEEN

Three Aminos, LLC, a limited liability company formed under the law of the State of Georgia, United States of America and having its principal place of business at 1215 Troon Ct, Alpharetta, GA, 30005, USA ("Three Aminos") ("Distributor");

AND

The ProImmune Company, L.L.C., a limited liability company formed under the law of the State of Delaware, United States of America and having its principal place of business at 64 East Market Street, Rhinebeck, New York 12572 ("ProImmune").

WHEREAS

ProImmune and Distributor are Parties to that certain Distribution Agreement dated April 24, 2020 (the "Agreement"), which the Parties amended effective April 26, 2020 ("First Amendment").

WHEREAS, concurrent with this Second Amendment, ProImmune and Distributor are entering into an agreement to develop, test, obtain regulatory approval for, and market formulations incorporating Immune Formulation 200® as an FDA-approved pharmaceutical drug (the "Pharmaceutical Agreement").

WHEREAS, concurrent with this Second Amendment, ProImmune and Distributor are entering into an agreement to further develop, commercialize, and co-own an Oxidative Stress Kit (the "Kit Agreement") (the Distribution Agreement as amended, Pharmaceutical Agreement, and Kit Agreement collectively, the "Agreements").

Capitalized terms not otherwise defined in this Amendment shall have the meanings ascribed to such terms under the Agreement.

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged and in consideration of the above premises and the mutual promises stated below, the Parties agree to amend the Agreement as follows:

1. Definitions. The following terms shall have the following meanings:

    1.1 "Phase III Clinical Trial" means a human clinical trial, the principle purpose of which is to demonstrate clinically and statistically the efficacy and safety of a

1

product for one or more indications in order to obtain marketing approval of such product for such indication(s), as further defined in 21 C.F.R. §312.21.

1.2 "Specification" means the composition of Immune Formulation 200 which is a proprietary mix of Selenium and amino acids (Glycine, L-Glutamine or a Glutamate source, and L-Cystine). This definition shall amend the prior definition of Specification in Section 1.11 of the Agreement.

1.3 "Website" means ProImmune's current official website (www.proimmuneco.com) through which customers can order Product as well as any future official website for the Product developed pursuant to the terms of this Second Amendment.

2. Revenue Share. Distributor shall be entitled to receive a revenue share based on sales of Immune Formulation 200® by ProImmune as a dietary supplement, over-the-counter drug, or prescription drug in the Territory for human consumption, other than sales to Distributor or to any entity jointly owned by the Parties, whether through ProImmune's official website or otherwise ("Revenue Share"), provided, however, that any Revenue Share shall only apply to amounts in excess of ProImmune's annual sales, not including any sales to Distributor or any subsidiary or affiliate of Distributor, calculated from the 365 day period immediately preceding the occurrence of a respective Triggering Event. A Triggering Event means the occurrence of any of the respective events contemplated in Sections 2.1-2.6 below. Revenue Share shall apply only upon the occurrence of a Triggering Event, only to applicable sales that occur after that Triggering Event, and only with respect to the amount of Revenue Share for that specific Triggering Event. In addition, for any Triggering Event to result in Revenue Share, the occurrence of that Triggering Event must be the result of activity undertaken by Distributor.

*[Handwritten margin note: Approved /s/ Laura Pile /s/ Albert C____ ]*

2.1 In the event that Immune Formulation 200® is formally endorsed or is issued a letter of support as an effective product by the Sovereign Order of Malta for promoting immune function and ProImmune is given permission to market Immune Formulation 200® as a product endorsed or supported by the Sovereign Order of Malta, Distributor shall receive Revenue Share in an amount equal to $0.01 per gram of Immune Formulation 200® sold.

2.2 In the event that within one (1) calendar year from the date of the filing of a patent for the treatment or prevention of COVID-19 as described in the Pharmaceutical Agreement (subject to any additional period of time permitted by applicable law, regulation, or governmental or quasi-governmental rule or order), an FDA approved Phase III Clinical Trial is completed with respect to Immune Formulation 200® for the treatment or prevention of COVID-19, Distributor shall receive Revenue Share in an amount equal to $0.01 per gram of Immune Formulation 200® sold.

2.3 In the event that within three (3) calendar years from the Effective Date, Immune Formulation 200® has a New Drug Application (NDA) approved by the U.S.

*[Handwritten margin/bottom note: 2.21 In the event that the current trial planned for Rwanda is completed but not considered an FDA approved Phase III Clinical Trial, the one (1) calendar year deadline shall be extended to allow Distributor to conduct a Phase III Clinical Trial, so long as Distributor does so in a commercially reasonable timeframe]*

Food and Drug Administration ("FDA") for either prescription or over-the-counter drug use for treatment or prevention of COVID-19, Distributor shall receive Revenue Share in an amount equal to $0.01 per gram of Immune Formulation 200® sold.

2.4   In the event that within one (1) calendar year from the date of the filing of a patent application for a special formulation incorporating Immune Formulation 200® ("Special Formulation") for the treatment or prevention of dyslipidemia, as described in the Pharmaceutical Agreement (subject to any additional period of time permitted by applicable law, regulation, or governmental or quasi-governmental rule or order), an FDA approved Phase III Clinical Trial is completed with respect to such Special Formulation, Distributor shall receive Revenue Share in an amount equal to $0.01 per gram of Immune Formulation 200® sold in connection with such Special Formulation.

2.5   In the event that within three (3) calendar years from the Effective Date, Immune Formulation 200® has a New Drug Application (NDA) approved by the FDA for either prescription or over-the-counter drug use for treatment or prevention of dyslipidemia, Distributor shall receive Revenue Share in an amount equal to $0.01 per gram of Immune Formulation 200® sold.

2.6   In the event that this Second Amendment, the Pharmaceutical Agreement, and the Kit Agreement are executed by the Parties, Distributor's Principal, Dr. Laura Lile, M.D., R.Ph., shall be the official spokesperson for the Product, but only during the time that Distributor is in good standing under this Agreement under the terms of Sections 2.6.1–2.6.7 ("Spokesperson"). During the time that Distributor is in good standing under the terms of Sections 2.6.1–2.6.7, Distributor shall receive Revenue Share in an amount equal to $0.01 per gram of Immune Formulation 200® sold from and after the Effective Date ("Spokesperson Revenue Share").

2.6.1   Any reasonable and customary costs and expenses of Spokesperson incurred in connection with the promotional efforts shall be exclusively borne by Distributor.

2.6.2   Spokesperson agrees to conduct herself with due regard to public conventions and morals, and agrees that she will not do or commit any act or thing that will degrade her in society or bring her into public hatred, contempt, scorn or ridicule, or that will shock, insult or offend the community or ridicule public morals or decency, or prejudice ProImmune or Product.

2.6.3   Spokesperson shall not serve as a spokesperson for any competitive product.

2.6.4   ProImmune shall have the right to use any and all publicity rights associated with Spokesperson, including name, likeness, characterization, visual and audio representation of Spokesperson in connection with marketing Product during the term of this Agreement, such uses to require advance written approval of

3



Spokesperson, not to be unreasonably withheld, conditioned or delayed. Spokesperson shall only promote in compliance with all applicable laws and regulations.

2.6.5 Spokesperson shall use commercially reasonable efforts to actively promote Product, including through her social media accounts and during appropriate public and semi-public appearances.

2.6.6 Spokesperson shall propose an annual marketing plan to ProImmune with a minimum list of events and activities that Spokesperson shall undertake during the year to promote Product. This marketing plan is subject to ProImmune's approval, not to be unreasonably withheld, conditioned, or delayed.

2.6.7 Spokesperson shall contribute a commercially reasonable amount of content and quotes for ProImmune press releases, social media campaigns, websites, and other marketing materials.

2.6.8 For the avoidance of doubt, nothing in this Agreement shall restrict ProImmune's communications, marketing or advertising. After the Effective Date, the Parties will work in good faith to jointly agree to a mission statement or value statement to guide marketing efforts.

3. Distributor shall bear the commercially reasonable cost and expense of any filings it makes to the FDA or any other regulatory agency, including any foreign analog or successor agency, with respect to the Products in accordance with the terms of the Pharmaceutical Agreement. For the Revenue Share in Sections 2.3 or 2.5 to trigger, Distributor must directly file and prosecute the respective NDAs, an activity for which ProImmune shall provide commercially reasonable assistance.

4. Revenue Share payments shall be due and payable by ProImmune to Distributor on a quarterly basis on or before the tenth (10th) calendar day of January, April, July, and October with respect to ProImmune sales from the three months prior to the most recent prior month (e.g., for January's payment, sales occurring in September to November of the preceding calendar year). ProImmune shall provide Distributor with a statement reporting ProImmune's sales for the applicable months along with its monthly Revenue Share payment. Should ProImmune fail to make any Revenue Share payment in full by the 10th calendar day of the month when due, such unpaid amounts shall bear interest from the date following the due date thereof to the date of payment at the rate of the greater of (i) eight percent (8%) per annum or (ii) the "Prime Rate" as published by the *Wall Street Journal* plus four percent (4%).

5. ProImmune shall maintain detailed records to substantiate all such Revenue Share payments. Distributor may, at its sole cost and expense, appoint an independent accounting firm ("Accountant") reasonably acceptable to ProImmune to inspect the relevant books of account, records and reports of ProImmune to verify any reports or statements provided, or amounts paid ("Revenue Share Audit"). The Accountant, and any individuals if applicable,



appointed to perform the Audit must execute ProImmune's standard non-disclosure agreement, or otherwise be subject to terms governing non-use and non-disclosure of information that ProImmune has agreed in writing are acceptable. Distributor may exercise its right to audit ProImmune no more than annually, and only once with respect to any specific period of time, and may only audit records for the preceding two (2) calendar years. The Accountant must provide at least thirty (30) calendar days prior written notice to ProImmune prior to any Revenue Share Audit. The Accountant shall be instructed to prove an audit report containing its conclusions regarding the Revenue Share Audit, and specifying whether the amounts paid were correct, and, if incorrect, the amount of any underpayment or overpayment. The audit report shall be the confidential information of ProImmune, and the Accountant shall further be instructed to redact any confidential information requested by ProImmune prior to providing the audit report to Distributor. After review of the auditor's report: (i) if there is an underpayment, then ProImmune shall pay to Distributor the full amount of that underpayment, and (ii) if there is an overpayment by ProImmune, then Distributor shall pay to ProImmune the full amount of that overpayment. If there is an underpayment of more than five percent (5%), ProImmune shall reimburse Distributor for the reasonable costs of the Audit.

6. So long as a Triggering Event has occurred during the term of this Agreement, Distributor's rights to receive the Revenue Share shall survive the termination or expiration of the Agreement indefinitely, except that the Revenue Share contemplated by Section 2.6 shall only survive so long as the conditions in Sections 2.6.1–2.6.7 continue to be met. Further notwithstanding the above, in the event that Distributor or a designated affiliate or subsidiary acquires twenty-five (25) percent or more of the outstanding equity in any ProImmune subsidiary or affiliate which owns or exclusively licenses (not including any direct or indirect licenses to Distributor) the Intellectual Property Rights necessary to commercialize Product in the Field, all Revenue Share shall immediately terminate.

7. Notwithstanding any term or condition of the Agreement to the contrary or in conflict, for the period ending March 31, 2021 (the "Initial Minimum Purchase Period"), Distributor agrees to purchase a minimum aggregate amount of Immune Formulation 200® for a total minimum order of $2 million, including amounts purchased prior to the Effective Date of this Second Amendment. For the one-year period after the Initial Minimum Purchase Period, namely April 1, 2021 to March 31, 2022, Distributor agrees to purchase a minimum aggregate amount of Immune Formulation 200® for a total minimum order of $3 million (the "Second Minimum Purchase Period"). Each one-year period thereafter (e.g., April 1, 2022–March 31, 2023; April 1, 2023–March 31, 2024; etc.), Distributor agrees to purchase a minimum aggregate amount of Immune Formulation 200® for a total minimum annual order of $6 million (the "Ongoing Minimum Purchase Period"). The minimum annual order in the Ongoing Minimum Purchase Period and in every subsequent one-year period shall be referred to as the "Minimum Annual Amount". Any purchases made in excess of annual requirements during any purchase period shall be rolled forward to apply to the subsequent purchase period (for example, if Distributor purchases $7 million between April 1, 2022 and March 31, 2023 then Distributor's Minimum Annual Amount for April 1, 2023 to March 31, 2024 would be $5 million; if Distributor purchases $13 million between April 1, 2022 and March 31, 2023 then Distributor's Minimum Annual Amount for April 1, 2023 to March 31,



2024 would be $0, and Distributor's Minimum Annual Amount for April 1, 2024 to March 31, 2025 would be $5 million). In the event that Distributor is unable to purchase the Minimum Annual Amount in a given Ongoing Minimum Purchase Period, the Parties agree to negotiate in good faith for a revised Minimum Annual Amount or an additional transition period based on Distributor's expenditures under the Kit Agreement and the Pharmaceutical Agreement. In the event that, pursuant to the Pharmaceutical Agreement, the Parties' jointly owned company completes a Phase III Clinical Trial and all of the primary outcomes for that trial are negative, then Distributor's Minimum Annual Amount shall remain at $3 million unless and until a subsequent Phase III Clinical Trial evaluating Product or a formulation incorporating Product has a positive outcome. Distributor shall achieve Priority Performance by meeting the applicable Minimum Annual Amount pursuant to the terms of this Section 7 of this Second Amendment as well as being in good standing under this Agreement. Notwithstanding the foregoing, if Distributor does not achieve the Minimum Annual Amount in any applicable period, (i) Distributor shall have a six (6) month grace period to meet the applicable Minimum Annual Amount for such period or (ii) Distributor shall be deemed to have met the applicable Minimum Annual Amount if Distributor's average orders for the most recent three (3) periods averages $6 million per period. For the purpose of clarity, ProImmune agrees to continue supplying Product to Distributor, and distributor shall achieve Priority Performance, so long as Distributor submits Purchase Orders in the Minimum Annual Amounts (including during any grace period) in accordance with the preceding terms. If at any time prior to Distributor achieving Permanent Priority Status pursuant to Section 18 Distributor fails to meet the Minimum Annual Amounts (including during any grace period or through such 3-year averages) for two consecutive years, ProImmune shall have no further obligation to continue supplying Product to Distributor, provided that without limiting Distributor's liability to ProImmune such failure shall not constitute a material breach of this Agreement by Distributor and in any event such failure shall not limit supply of Product for clinical trials or pharmaceutical formulations pursuant to the Pharmaceutical Agreement. For purposes of clarity, the Parties agree that any payments made to ProImmune for Product purchased by or manufactured by Distributor, as well as any payments made to ProImmune pursuant to the Pharmaceutical Agreement for Product purchased or manufactured in connection with clinical trials, as well as any payments made to ProImmune pursuant to the Kit Agreement for Product purchased or manufactured by the Parties' jointly owned company, as well as any payments made to ProImmune for Product purchased or manufactured for pharmaceutical formulations, shall be credited toward Distributor's Annual Minimum Amounts. In addition, money paid to third parties pursuant to the Pharmaceutical Agreement by the Parties' jointly owned company for manufacturing pharmaceutical grade Product shall also be credited toward Distributor's Annual Minimum Amounts.

8. Distributor shall have the right to arrange for the manufacture of Product at Distributor's cost and expense (including without limitation for the purpose of ensuring compliance with all FDA rules and regulations for pharmaceutical drug approval), provided that ProImmune shall have the right to approve the manufacturer to be utilized by Distributor (such approval not to be unreasonably withheld, conditioned or delayed).

   8.1. In the event Distributor elects to manufacture Product at Distributor's cost and expense, ProImmune shall provide all formulas, compounds, preparations, components, know-how



and other intellectual property to investigate and select potential manufactures and to enable Distributor to arrange for the manufacture of Product in the event, and for so long as, Distributor exercises such right. ProImmune shall have the right, upon fifteen (15) days' prior written notice, to inspect the facility of the manufacturer utilized by Distributor for purposes of quality assurance/quality control with respect to Product, provided a representative of Distributor shall have the right to attend any such inspections and such inspections shall be no more frequent than one (1) time per calendar quarter. Distributor shall report to ProImmune with respect to quantities of Product so manufactured, and ProImmune shall have access to Distributor's manufacturing records to confirm such amounts. In the event that Distributor elects to manufacture directly, it shall pay ProImmune $0.08 for each gram of Product manufactured ("Manufacture Payment"), provided such Manufacturing Payment shall not apply to Product purchased or manufactured by the Parties under or pursuant to the Pharmaceutical Agreement, whether in connection with Clinical Trials conducted or the manufacture and sale of product comprising such formulations ("Pharmaceutical Agreement Purchases") provided further that in no case may Product be sold pursuant to the Pharmaceutical Agreement other than as a component of formulations sold following FDA approval as a prescription or over-the-counter drug. After the Effective Date, ProImmune may increase the Manufacture Payment by no more than ten (10) percent annually. Manufacture Payment shall be due within ten (10) days of the end of each calendar month and shall include payment for any Product that was manufactured during the preceding month. Any Manufacture Payments made to ProImmune will be applied to Distributor's Annual Minimum Amounts.

9. Section 4.9 of the Agreement shall be amended and restated in its entirety as follows: ProImmune will make a good faith effort to make Requested Amount available to Distributor no later than fifteen (15) weeks from ProImmune's receipt of the Initial Funds in cleared funds, and shall make a good faith effort to make Requested Amount available to Distributor sooner as manufacturing timelines allow, provided that ProImmune shall regularly update Distributor regarding anticipated Product availability during the term of this Agreement. Distributor agrees and understands that manufacturing requires advanced notice and ordering of components, and the availability and lead time of components varies according to a variety of factors. In the event that Distributor elects to rely on ProImmune for manufacturing, Distributor agrees to make commercially reasonable efforts to provide ProImmune with an estimated schedule of Purchase Orders and to update this schedule on a rolling, but no less than quarterly basis, to enable ProImmune to plan for production demand. Distributor also understands that COVID-19 has and may cause additional delays to production timeframes, provided that ProImmune shall regularly update Distributor with respect to such delays, and such delays shall extend any obligations or requirements of Distributor under this Agreement on a day-for-day basis.

10. Distributor understands that that the amount of Product actually supplied may vary by up to five percent compared to the amount requested and paid for, due to the manufacturing process utilized by ProImmune. For any order in which the amount of Product actually supplied is ninety-five (95) percent or less of the Requested Amount, Distributor will receive a pro rata discount based on the percentage of the Purchase Amount actually made available within thirty (30) days of the Actual Pickup Date.



11. Section 5.1 of the Agreement shall be amended and restated in its entirety as follows: Prior to April 24, 2020, the price for 1,000 kg or more of bulk Product will be $0.10 per gram ("Bulk Price"). After April 24, 2020, ProImmune may increase the Bulk Price by no more than ten (10) percent annually. In addition, ProImmune may further increase the Bulk Price on the basis of changes to its actual costs.

12. Notwithstanding the terms of Section 5.1 of the Agreement or Section 8.1 of this Second Amendment, the price of Product purchased by the Parties' jointly owned company pursuant to the Pharmaceutical Agreement shall be the actual costs of manufacturing Product incurred by ProImmune in the event ProImmune is arranging for the manufacture of such Product.

13. Notwithstanding any terms of the Agreement to the contrary or in conflict, any failure to deliver Product within the periods set forth in the amended Section 4.9 shall operate to extend the period of time set forth within which Distributor must achieve the Minimum Annual and Priority Performance by one day per each day of such delay.

14. Except as expressly provided in the Agreement, neither Party has made or makes representations or warranties. Further, each Party agrees it is not entering into this Agreement in reliance upon any statements, representations or warrantees made by the other Party except for those expressly provided in this Agreement. The Parties have expertise, knowledge and sophistication in financial and business matters generally and with respect to dietary supplements such as the Product that make them capable of evaluating, and they have evaluated, the merits and risks of the Agreement. Both Parties are relying on and will rely solely on the provisions of this Agreement and their own independent investigation and evaluation of the Product and the value thereof notwithstanding any information asymmetry between the Parties.

15. Distributor acknowledges that ProImmune's retail price and manufacturer suggested retail price (MSRP) shall now be $75 per 100 grams.

16. Online Sales:

    16.1. ProImmune and Distributor shall agree upon a system or systems to help direct new customers converted by Spokesperson to purchase Product from Distributor rather than directly from ProImmune, which the Parties shall work in good faith to conclude within ninety (90) days of the Effective Date of this Second Amendment. This may include, without limitation:

    16.1.1. A joint website ("Joint Website") rather than the Parties independently operating individual websites. In the event a Joint Website is agreed upon, the Parties expect the following terms would be included in a subsequent agreement to operate a joint website:
    16.1.1.1. It shall operate at the Website's current URL, or such URL as the Parties may agree to from time to time, and Distributor's current website shall redirect to the Joint Website's URL.



16.1.1.2. The layout and content of the Joint Website, including any future modifications thereto, shall be mutually agreeable to the Parties.

16.1.1.3. The Parties shall mutually agree on the Joint Website budget and shall share equally in the third-party costs and expenses related thereto.

16.1.1.4. The Parties shall cooperate in creating a plan for fulfilling orders made through the Joint Website and shall share in the costs and expenses related thereto.

16.1.1.5. A system for ensuring the Parties equitably share in the sales generated from the Joint Website considering sales to each Parties' respective customers and all sales not attributable to either Party's customers.

16.1.1.6. ProImmune shall be the owner of all Intellectual Property Rights in and to the Website.

16.1.2. The Website may include a means of redirection to Distributor such as a link to www.orderproimmune.com.

16.1.3. The websites operated by both Parties may utilize customer codes, by which customers may enter a code that triages customer orders to the respective Parties.

17. The Parties shall negotiate in good faith to enter into a stock option agreement pursuant to which Three Aminos or its designated affiliate shall have the right to purchase common stock in each enumerated ProImmune subsidiary or affiliate in the amounts set forth therein (the "Stock Options Agreement"), and the Parties hope to conclude this agreement within ninety (90) days of the Effective Date of this Second Amendment. The Parties intend the Stock Options shall be exercisable by Three Aminos (or its affiliate) from and after the third anniversary of the Effective Date of this Second Amendment (but only if Three Aminos has otherwise been in good standing under the Agreements) and that the purchase price of the stock subject to the Stock Option Agreement shall be based on an independent valuation of ProImmune from a mutually agreeable valuation firm without any conflict of interest as of the date the options are exercised.

18. The Parties agree that once Distributor has paid $25 million in the aggregate under the terms of the Agreement, (i) Distributor shall no longer be obligated to achieve any Minimum Annual Amount hereunder, (ii) any Purchase Orders by Distributor thereafter shall nonetheless have Priority and Distributor shall nonetheless be regarded as having achieved Priority Performance hereunder, and (iii) Distributor shall nonetheless have all rights, and ProImmune shall have all obligations hereunder, as if Distributor has achieved Minimum Annual Amounts ("Permanent Priority Status").

19. Notwithstanding any term or condition of the Agreement, First Amendment or this Second Amendment to the contrary or in conflict, the terms and conditions of the Agreement, First Amendment and the Second Amendment shall be binding on upon the successors and assigns of the Parties as well as the successors-in-interest in and to the Product and its related Intellectual Property Rights.

20. In the event of a conflict between the Agreement, First Amendment and this Second Amendment, this Second Amendment shall control.

21. Other than as amended by the First Amendment and Second Amendment, the terms and conditions of the Agreement shall continue in full force and effect. The Parties hereby agree that this Second Amendment may be executed in counterparts.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]



IN WITNESS whereof this Second Amendment been executed by the Parties through their duly authorized representatives as of the Effective Date hereof.

Signed: _/s/ Albert Crum MD_
Name: Dr Albert Crum
Title: Chief Executive Officer
Organization: The ProImmune Company, L.L.C.
Date: 07 NOV 2020

Signed: _/s/ Dr. Laura Lile M.D., R.Ph._
Name: Dr. Laura Lile, M.D., R.Ph.
Title: Chief Executive Officer
Organization: Three Aminos, LLC
Date: 11/7/2020

Signed: _/s/ Dr. Laura Lile M.D., R.Ph._
Name: Dr. Laura Lile, M.D., R.Ph.
In an individual capacity with respect to Section 6.
Date: 11/07/2020

11